UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| Jay Hymas | **VERIFIED COMPLAINT AND REQUEST FOR TRO/INJUNCTION** |
| Plaintiff, | |
| | Case No. 3:23-CV-336 |
| | Corker/McCook |
| v. | Demand for Temporary Retraining Order |
| United States Department of State, | Demand for Jury Trial |
| United States Department of Treasury, | Demand for Injunctive Relief |
| Defendants. | Demand for Class Action |

**ISSUES:** The Constitutional and statutory controversies at issue in this case are the freedom to travel and the denial of a passport and passport card. Specifically, 22 U.S.C. 2671 regarding when it is appropriate and lawful to not issue/renew a citizen's passport and passport card.

Plaintiff submits that it is self-evident. baring criminal conviction or allegation of criminal activity, that a citizen enjoys the absolute natural right to freedom of movement both within and without the fifty States comprising the United States of America.

However, the United States Code 8 U.S.C. 1185 (b) states:

> "Except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe, it shall be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid United States passport."

The only way this statue can be Constitutional is if a passport is not restricted in its issuance so as to interfere with a citizen's natural right to travel, else Congress and the President of the United States could equally make a law requiring passports to permit entering houses of worship and equally revoke them at whatever real or imagined debt or conduct they desired, or similar such schemes curtailing or eliminating other Constitutional or Natural rights.

Congress and the President of the United States have recognized this God-given natural right when the United Nations' Universal Declaration on Human Rights treaty was signed by the United States. Article 13 of this treaty states:

1

> *"Everyone has the right to freedom of movement and residence within the borders of each state. Everyone has <u>**the right to leave any country, including his own, and to return to his country.**</u>"*

The United States Senate recently reaffirmed on December 8, 2020 these rights by Senate Resolution 475 (cf. Exhibit A):

> *"Whereas December 10 of each year is celebrated around the world as 'Human Rights Day': Now, therefore, be it Resolved, That the Senate— ... recognizes the 73rd anniversary of the Universal Declaration of Human Rights; reaffirms the Universal Declaration of Human Rights"*

Regardless, the People of the United States have never authorized the empowerment of the federal government of the United States with the authority to restrict travel in any way – whether domestic or international – by amending the Constitution to restrict the free movement of the People of the United States. This assumes that it is even possible that the Constitution could be amended to restrict a God-given (i.e. natural right/human right/fundamental right) as movement is near to breathing, shelter, food, etc. in contrast to a lesser right, like a granted Constitutional right, such as a right to vote or a right to a jury trial at a threshold of 20 dollars, etc. Natural rights are not granted by mankind, or governments and are fundamental, nor can they be abrogated by anyone, they are as the word implies…"natural".

Black's Law dictionary, 2nd ed., states the following regarding Natural rights:

> *"A rule of conduct arising out of the natural relations of human beings, established by the Creator, and existing prior to any positive precept Webster. The foundation of this law is placed by the best writers in the will of God, discovered by right reason, and aided by divine revelation; and its principles, when applicable, apply with equal obligation to individuals and to nations."*

Additionally, the Department of State is violating its own regulations, specifically 22 CFR 51.60 (a) wherein passport renewals can be denied for default on a loan issued under 22 U.S.C. 2671 (b) (2) (B) and not 22 U.S.C. 2671 (b) (2) (A). The law, the Department of State's own regulations and the Department's Foreign Affairs Manual are clear that evacuations under 22 U.S.C. 2671 (b) (2) (A) are not part of the Repatriation Loan Program which is a prerequisite for legal authority to deny the issuance/renewal of a passport under 22 U.S.C. 2671 (d) (3).

In this case, and undoubtedly thousands of others[1] that were evacuated under authority of 22 U.S.C. 2671 (b) (2) (A) during the COVID-19 pandemic, there is no loan program, only an evacuation program that may require a reimbursement.[2] This is no loan, just a promise to pay something that may or may not be required, but regardless, nothing *"greater than the amount the person evacuated would have been charged for a reasonable commercial air fare immediately prior to the events giving rise to the evacuation"* (cf. 22 USC 2671 (b) (2) (A)).

In this instant case the State Department breached its own contract with Plaintiff by initially seeking approximately $1,600 for what should have been something closer to $150 as the signed "contract"

---

[1] This case occurred due to the global COVID-19 pandemic. From Plaintiff's evacuation flight alone there were approximately 300 evacuees.
[2] The statute states "reimbursement" should be on a basis of "maximum extent practicable" which is not an absolute mandatory requirement in contrast with the requirements of the "Repatriation Loan Program", cf. 22 USC 2671 (d).

2

clearly stipulated.[3] But worse than the initial extortion the Department of State sought to affect, it is now violating the rights of citizens to a passport by lumping people evacuated via the natural disaster provisions of 22 U.S.C. 2671 (b) (2) (A) with "destitute" people who voluntarily borrow money from the Department under the wholly different Repatriation Loan Program of 22 U.S.C. 2671 (b) (2) (B).

The authority of the State Department to fund the evacuation of people from areas of natural disaster was originally codified by Public Law 98-164, Sec. 122, on November 22, 1983:

> *"the evacuation of United States Government employees and their dependents and private United States citizens when their lives are endangered by war, civil unrest, or natural disaster."*

Notice there is no "loaning" of money here nor the requirement of any "reimbursement" whatsoever. The cost is simply born by the account funded by Congress and usually funded around $15,000,000 per year. The requirement to "reimburse" for an "economy class" airfare would not be authorized until the enactment of Public Law 107-228 on September 30, 2002.

Congress also, with the same legislation, codified a separate subpart for "loans" to "destitute" United States citizens needing to return (repatriation) to the United States via these loans:

> *"**loans** made to **destitute citizens** of the United States who are outside the United States and made to provide for the return to the United States of its citizens"* (emphasis added)

These "loans" are what became known as the "Repatriation Loan Program" (hereinafter "RLP") by 22 U.S.C. 2671 (d). It was these loans, and only these loans, that the denial of a passport was tied to by 22 U.S.C. 2671 (d) (3) and not evacuation promissory notes deriving from 22 USC 2671 (b) (2) (A).

Prior to this law, 22 U.S.C. 2671 only had a generic authorization for "*unforeseen emergencies arising in the diplomatic and consular service*". There was no legal authorization for funding private United States citizens whatsoever.

The denial of passports is also covered by Public Law 98-164 at Section 122 (d) (3):

> *"With regard to the repatriation loan program, the Secretary of State shall ... (3) bar passports from being issued or renewed for those individuals who are in default"*

But notice this passport denial is only for "loans", specifically loans associated with the "repatriation loan program". This loan program can only be referring to "destitute citizens" in need of a repatriation "loan" because the subpart referring to the emergency evacuation of citizens for wars and natural disaster does not require a loan or repayment of any kind whatsoever under the original enabling legislation from 1983, i.e. Public Law 98-164. At that time **the evacuations did not require the citizen to pay anything**. At that time Congress appropriated money for the evacuation of citizens and the cost was born solely by the United States taxpayer.

Further proof that the RLP does not include evacuees such as Plaintiff under 2671 (b) (2) (A) is found in the Supporting Statement submitted with the Federal Register submission for the original form (DS-3072, 3-24-2003) implementing the establishment of a form to carry out the RLP, wherein it is stated:

---

[3] An executed Department of State DS-5528 form that Plaintiff does not have in his possession.

3

> *"22 U.S.C. § 2671(b)(2)(B) provides that such emergency expenditures include loans made to destitute U.S. citizens who are outside of the United States for the purpose of their return to the United States. **This is known as the repatriation loan program.** 22 U.S.C. § 2671(d) sets forth what the Secretary of State shall require in an application for a repatriation loan, collection procedures, **and passport limitations.**"* (cf. Exhibit B)

The RLP, and hence the passport restrictions of subpart (d), are only applicable to 22 U.S.C. 2671(b)(2)(B) (i.e. the RLP) and not 22 U.S.C. § 2671(b)(2)(A) (i.e. the evacuation program).

The question follows of how this conflation came to be? Congress next amended 22 U.S.C. § 2671(b)(2) in enacting Public Law 107-228 on September 30th, 2002. From the Congressional Report 107-57 (May 4, 2001), page 48, dealing with Public Law 107-228 we begin to learn the answer:

> *"Reimbursements for Emergency Overseas Evacuation. H.R. 1646 would allow the State Department to seek reimbursements for the emergency evacuation of employees of the U.S. government, their dependents, private U.S. citizens, and foreign nationals. **According to the Department of State, this section of the bill codifies existing practice and would have no impact on the budget.**"* (cf. Exhibit C)

What a dumbfounding admission by the Department of State to Congress, that contrary to law, they had been unlawfully supplementing their budget by having evacuees "reimburse" the Department of State directly when all the while Congress had been appropriating money to provide for the evacuation of government employees and private U.S. citizens on a **non**-reimbursable basis, i.e. gratis. Rather than punish the Department of State for this unlawful conduct, Congress rewarded their request and granted more authority by codifying a reimbursement requirement from evacuees for "reasonable commercial airfare" via Public Law 107-228.

But here we are almost 21 years later and now discovering that the Department of State is repeating their past unlawful behavior by not being satisfied in collecting reimbursements into their already appropriated accounts for the evacuation of U.S. citizens from natural disasters, etc. No, now they have usurped an extra-legal and over-the-top power, never authorized by the People or their congressional representatives, to withhold a vital and needed document, to use as a cudgel to extort vastly excessive amounts of money. By necessity, arising from 8 U.S.C. 1185 (b), citizens need a passport to be at liberty to travel, therefore it cannot be withheld without a just and common-law reason…for it has been written, that it is within this very God-given right, that "we live, and move, and have our being".

**CAUSES OF ACTION:** The first cause of action is that the Departments of State and Treasury are seeking to extort over $2,500 for something that should have been around $150 and using Plaintiff's natural right to travel coupled with denying a passport as an unforgiving "incentive" to pay the extorted amount.

Cause number two is the violation of Constitutional rights from the unlawful restricting of the liberty to travel by denial of both a passport and a passport card.

Cause number three is not providing due-process (i.e. a hearing) prior to the deprivation of this liberty (i.e. the natural right to travel) in violation of the Constitutional due-process rights guaranteed by the

4

Fifth and Fourteenth Amendments to the Constitution to have due-process **BEFORE** depriving a liberty, i.e. *"nor be deprived of life, liberty, or property, **without** due process of law"*.

Cause number four it that the Department of State is violating its own regulations in denying Plaintiff's passport renewal. This unlawful statutory and regulatory denial is not only arbitrary and capricious but also a violation of the Administrative Procedures Act (5 U.S.C. chapter 5, hereinafter "APA"). The various regulations and Foreign Affairs Manual make it clear that reimbursement is to be for an "economy fare" and that denial of passports and their renewals is only for loans under the RLP and not "evacuees". And that passport cards are only denied for sex-offenders and not evacuees, cf. 22 CFR 51.60 (g). This court should exercise its oversight capacity under the APA to address these violations.[4]

**JURISDICTION:** This court has jurisdiction regarding this matter as it involves Natural rights, Constitutional rights or as the United Nation puts is – Human Rights, as well as what powers if any have been specifically given to the federal government of the United States to restrict or impede this natural or "Human Right".

Jurisdiction is also obtained as the governing statutes are "federal", i.e. within the purview of this court. And under the Administrative Procedures Act (5 U.S.C. chapter 5) this court has oversight responsibilities regarding the regulations that follow from 22 U.S.C. 2671, specifically 22 CFR 51.

**EVENTS OF CONTROVERCY:** On or about early March 2020 Plaintiff made a trip to South America, while there the spread of COVID-19 greatly increased which led to the cancellation of Plaintiff's commercial return flight. Plaintiff believes that many thousands if not tens of thousands of other citizens of the United States suffered the same fate. Without any way to return to the United States in the foreseeable future, whether by land, sea or air, Plaintiff made contact with the local embassy website as he had been made aware of potential evacuation flights by the Department of State in news articles.

After contact with the embassy Plaintiff was told to arrive at the airport on March 27th, 2020 at noon. After completing a Department of State form (DS-5528) at the airport Plaintiff then boarded the fight and returned to the United States.

Plaintiff recalls receiving, approximately 6 months later, a bill for the flight via U.S. mail for something like $1,600. Plaintiff responded by mail that the amount requested was approximately 10 times the amount of what a "full-fare economy flight" (words of the DS-5528 form) was at that time. To date Plaintiff has not received any further contact whatsoever regarding his passport and passport card.

Plaintiff never received a response to his dispute of the determination of the amount. Plaintiff later then completely forgot about the issue until attempting to renew his passport in person on August 9, 2023. After completing all the requirements and paying the cost to renew a passport and passport card and spending approximately 8 hours at the passport office, Plaintiff was informed there was a "hold" and that a passport would not be issued. Plaintiff was told that someone would be calling him the next day

---

[4] In this action Plaintiff does not dispute a certain amount of money may be justly required, he only disputes the amount and the egregious fact that the Department of State has unlawfully tied this rather minuscule debt to the renewal of his passport, all without any opportunity to dispute or appeal the determination before it has been decided.

to explain the "hold". Two days later Plaintiff was left a voicemail giving a number to call but there was no explanation. Plaintiff tried calling the number back multiple times but there was no answer.

Plaintiff then tried calling the number given and was connected with a person from the United States Department of Treasury who could not help Plaintiff in any way, claiming there was no issue. After maybe 8 more calls over the ensuing days Plaintiff was finally told he had an approximate $2,500 debt with the Department of Treasury that had come from the Department of State. No further information could be given. Calling many various Department of State numbers over the ensuing days at random, Plaintiff was eventually connected with the Office of "Accounts Receivable Branch" of the Department of State. It was here that Plaintiff learned that the debt was arising from the evacuation flight of 2020.

Plaintiff's efforts to dispute the monetary amount and the separate issue of the unlawful denial of Plaintiff's passport renewal and passport card issuance have not been answered. Both the Department of Treasury and Department of State refuse to even acknowledge Plaintiff's issues and the erroneous debt amount and the unlawfulness of the passport renewal denial. Neither department will even acknowledge Plaintiff's sincere communications let alone provide a due-process path to dispute both the debt amount and the unlawful connection of the passport renewal to the debt amount. For a more detailed history of these interactions please see Exhibits D and E.

**RELIEF SOUGHT:** Plaintiff seeks the following relief:

1) An immediate Temporary Restraining Order returning to the status quo allowing for the immediate issuance of a passport in favor of the Plaintiff,
2) Injunctive relief from the denial of Plaintiff's passport and passport card renewal/denial,
3) Jury trial to determine the true "economy fare" price that Plaintiff should pay for his 2020 evacuation flight and elimination of the currently claimed Department of Treasury debt,
4) Jury trial to determine monetary damages for the violation of Plaintiff's Constitutional rights including the liberty right to travel and the violation of due-process rights,
5) Damages of $1,000 per day from August 9, 2023 deriving from the loss of Plaintiff's passport,
6) Legal costs, court fees, punitive awards and attorney expenses,
7) Regardless of a passport renewal denial, the Department of State should be ordered to issue a passport card as that is not restricted and Plaintiff applied and paid the fee,
8) Return of Plaintiff's fee amount for a passport card if a passport card is not to issue,
9) Declaratory relief for Plaintiff and all citizens that evacuations under 22 U.S.C. 2671 (b) (2) (A) are not subject to passport denials under any circumstances both by law and as a Natural right,
10) Certification as a class-action suit to address the many other citizens that have had their property rights violated due to excessive fare amounts imposed and Constitutional rights violated in regards to travel and passport renewals.
11) Whatsoever further relief that is useful and just as the court finds appropriate.

I hereby certify under penalty of perjury that the above complaint is true to the best of my information, knowledge and belief.

Signed this 18th day of September, 2023.

_____
Jay Hymas - Plaintiff

6